UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

MARK J. HOWARD,                    )
                                   )
                                   )
v.                                 )        Criminal No. 05-13-P-H
                                   )        Civil No. 07-27-P-H
                                   )
UNITED STATES OF AMERICA,  )
                                   )
                                   )

**ORDER ON MOTION FOR DISCOVERY AND**
**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION**

Mark J. Howard was sentenced by this Court to 70 months in prison after he pled
guilty to two counts charging him with possession/distribution of marijuana.  Howard has
filed a 28 U.S.C. § 2255 motion listing six ineffective assistance grounds. In addition to
his form 28 U.S.C. § 2255 motion, Howard has filed a lengthy memorandum explicating
his claims.  Howard has also filed a motion for discovery. (Docket No. 5.)  The United
States has filed a response to these pleadings asking that Howard be denied habeas relief
summarily, without providing him with an evidentiary hearing, and that the motion for
discovery be denied.  I do deny Howard's motion for discovery and I recommend that the
Court deny Howard 28 U.S.C. § 2255 relief.

*DISCUSSION*

***Standards Applicable to the Review of Howard's Habeas Grounds***

Howard is entitled to 28 U.S.C. § 2255 relief only if his "sentence was imposed
in violation of the Constitution or laws of the United States, or that the court was without
jurisdiction to impose such sentence, or that the sentence was in excess of the maximum

authorized by law, or is otherwise subject to collateral attack"  28 U.S.C. § 2255 ¶ 1.

With respect to this Court's review of Howard's § 2255 claims,  the motion "is subject to

dismissal, without an evidentiary hearing, if the grounds for relief either are not

cognizable under section 2255 or amount to mere 'bald' assertions without sufficiently

particular and supportive allegations of fact."  Barrett v. United States, 965 F.2d 1184,

1186 (1st Cir. 1992) (citing Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974).

The rule of thumb is that Sixth Amendment ineffective assistance claims are

properly saved for airing in a 28 U.S.C. § 2255 proceeding.  With respect to such

challenges the First Circuit has explained:

> The Sixth Amendment to the United States Constitution guarantees
> that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to
> have the Assistance of Counsel for his defence." It is well settled that this
> right to effective assistance of counsel attaches at all critical stages of the
> trial, United States v. Wade, 388 U.S. 218 (1967), including at sentencing.
> Gardner v. Florida, 430 U.S. 349, 358 (1977) (holding that "sentencing is
> a critical stage of the criminal proceeding at which [defendant] is entitled
> to the effective assistance of counsel").
> The touchstone for any ineffective assistance of counsel claim is
> the two-part test laid down by the Supreme Court in Strickland v.
> Washington, 466 U.S. 668(1984).
>
> > First, the defendant must show that counsel's performance
> > was deficient. This requires showing that counsel made errors so
> > serious that counsel was not functioning as the "counsel"
> > guaranteed the defendant by the Sixth Amendment. Second, the
> > defendant must show that the deficient performance prejudiced the
> > defense. This requires showing that counsel's errors were so
> > serious as to deprive the defendant of a fair trial, a trial whose
> > result is reliable.
>
> Id. at 687. In other words, defendant 'must show that counsel's
> performance was so deficient that it prejudiced his defense." United States
> v. Ademaj, 170 F.3d 58, 64 (1st Cir.1999) (summarizing Strickland ). As
> the Strickland Court explained, "[u]nless a defendant makes both
> showings, it cannot be said that the conviction or death sentence resulted
> from a breakdown in the adversary process that renders the result
> unreliable."  Strickland, 466 U.S. at 687.

United States v. Colon-Torres, 382 F.3d 76, 85 -86 (1st Cir. 2004). The Strickland test

applies to ineffective-assistance claims arising out of the plea process.  See Hill v.

Lockhart, 474 U.S. 52, 58-59 (1985).

Additionally, this Court can draw on its own first-hand knowledge of counsels'

performance at the trial and sentencing in weighing the merits of his claims.  See United

States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993).

### First Circuit's Disposition on Direct Appeal

The First Circuit Court of Appeals entered the following judgment on Howard's

direct appeal.

> Defendant-appellant Mark Howard was convicted on two counts of
> selling marijuana. He pled guilty pursuant to an agreement with federal
> prosecutors and was sentenced in the United States District Court for the
> District of Maine according to advisory application of the U.S. Sentencing
> Guidelines.  To meet the lower end of the applicable guideline range, the
> district imposed the statutory maximum of sixty months imprisonment for
> the first count and ten months for the second count, yielding a total term of
> imprisonment of seventy months.  Howard was also sentenced to two
> years of supervised release, as a condition of which he is obliged to
> consent to searches of his property based upon 'reasonable suspicion.'
> Howard now challenges his sentence on several grounds, none of which
> were preserved below.
> 
> Howard contends that, before he pled guilty, the district court did
> not inform him adequately of the possibility that the terms of
> imprisonment for each count could run consecutively.  Howard was
> advised that each count carried a maximum term of imprisonment of five
> years. Nothing the court said implied that these terms were sure to be
> concurrent, and it was incumbent upon Howard to seek any further
> clarification of a facially adequate explanation of the penalties he faced.
> Howard also disputes the finding on drug quantity predicating his
> sentence, but his contentions are meritless.  The prosecution did not
> commit itself to limit the drug quantity alleged to the amounts physically
> recovered from Howard.  The district court did, explicitly, invite the
> parties to submit evidence at the sentencing hearing.  Howard's statements
> against penal interest were sufficient to establish a reasonable estimate of
> the quantities he transacted over time. Howard's facial challenge to the
> search condition in his supervised release term is not compelling.  The
> U.S. Supreme Court has made it clear that supervised offenders pose a

3

special risk of recidivism and concealment, justifying warrantless searches based on mere reasonable suspicion  United States v. Knights, 543 U.S. 112 (2001)(rejecting Fourth Amendment challenge). Judgment affirmed.

United States v. Howard, No. 05-2132 (1st Cir. July 21, 2006).  Some of the conclusions in this decision relate to Howard's 28 U.S.C. § 2255 claims.

**Howard's Six Ineffective Assistance of Counsel Claims**

**Counsel's Failure to Challenge Errors in the Pre-sentence Investigation Report (Ground I) and Counsel's Ineffectiveness at Sentencing (Ground V)**

In his first 28 U.S.C. § 2255 ground Howard complains that his attorney made little effort to dispute representations within the Pre-sentence Investigation Report (PSI) that were clearly erroneous and/or challengeable.   Rather, Howard laments, all his attorney did was indicate that he was objecting on the ground that the factor in question had to be proved at a beyond a reasonable doubt standard.

Howard identifies four paragraphs in the PSI that he believes counsel failed to adequately challenge.

**Paragraph 5:**

Paragraph 5 of the PSI reads:

In post-Miranda statements to the DEA, Howard told the agents that the marijuana and firearms located in the safe were his.  Howard also surrendered his laptop computer and four pages of handwritten notes. Howard said that the notes contained information about money owed by him and owed to him for marijuana sales.  Howard also said that the $17,650 located in his bedroom were profits of his marijuana sales. Howard told agents that he had been selling and using marijuana for 10 years.

(Howard PSI ¶ 5.)

Howard protests in his 28 U.S.C. § 2255 memorandum that he "never stated that any money recovered by the Government from [his] house was money that represented

4

the proceeds from the sale of marijuana." (Sec. 2255 Mem. at 2.)   He also contends that

he never said that he had been selling marijuana for ten years. (Id.)   Howard seems to be

arguing that the $17,650 profits related to sales for a two-year period (reflected in the

charging document) and not a ten-year period. (Id.)

### Paragraph 6

Paragraph 6 of the PSI represents:

> Howard said that from September 2000 to September 2001, he received
> and distributed 100 to 150 pounds of marijuana per month. Howard told
> agents that his supplier during this time period was Chester Beauchesne.
> (Howard said the marijuana seized from the safe had recently been
> delivered by Beauchesne on November 3, 2004.)

(Howard PSI ¶ 6.)

Howard asserts that the representations in this paragraph were "proven to be false

and unreliable by the Government itself." (Sec. 2255 Mem. at 2.)  He faults his attorney

for allowing the United States to attribute Mr. Beauchesne's possession and sales to

Howard and for failing to object to the hearsay evidence used in relation to this

attribution. (Id. at 3.)

### Paragraph 8

Paragraph 8 of the PSI states:

> From September 2002 to November 2004, Howard distributed between 30
> to 50 pounds of marijuana obtained from Beauchesne, per month, and
> another 50 pounds of marijuana per month, with Justin Chamberland as a
> source of supply.  Howard reported that (1) he normally paid $1,000-
> $2,000 per pound for the marijuana obtained from Beauchesne and
> Chamberland; (2) he profited approximately $100-$200 per pound; and (3)
> he profited about $5,000 per month from his marijuana distribution.
> Howard further reported that he used the profits from his marijuana sales
> to cover his monthly bills and the costs associated with his Urban Garden
> Store.

(Howard PSI ¶ 8.)

Howard complains that his attorney only objected to the paragraph on the simple ground that the statements were not proven beyond a reasonable doubt.  (Sec. 2255 Mem. at 3.)  Howard opines that the statements in this paragraph are "factually impossible." (Id.)   He asserts that Beauchesne was incarcerated at the alleged time of the distribution and that, at a distribution rate of 80 to 100 pounds per month the profits would be $8,000 to $20,000 per month and not $5,000 per month.  (Id.)  This proves, Howard believes, that the allegations made in Paragraph 8 are "inconsistent" and "nothing more than wishful thinking."  (Id.)

**Paragraph 15**

Paragraph 15 indicates, apropos offense level computation:

> Pursuant to U.S.S.G. § 3D1.2(d), counts are to be grouped into a single group (1) when the offense level is determined on the basis of a total amount of harm or loss, a quantity of substance involved, or some other measure of aggregate harm; (2) when the offense behavior is ongoing or continuous in nature; and (3) when the offense guidelines are written to cover such behavior.  In this case the two counts of conviction will be grouped into a single group as the offense level is determined on the basis of an aggregated drug quantity.

(Howard PSI ¶ 15.)

Howard relays that in his PSI objection his attorney argued that both counts should not be grouped together under U.S.S.G § 3D1.2(d).  (Sec. 2255 Mem. at 3.)[1] Howard maintains that by this objection his attorney exposed Howard to an additional five years of prison time, which in fact resulted in an additional ten months of prison time above the statutory maximum than would have been the case had the two counts been grouped per the PSI. (Id. at 4.)

---

[1]     The PSI notes the objection to Paragraph 15:  "With respect to paragraph 15, the defendant states that he 'disagrees that grouping need occur because of the objection to the calculation of the drug quantity.'" (PSI at 18.)

6

As to this claim, Howard also notes that the Assistant United States Attorney pressed an objection to the PSI, highlighting that the statement regarding drug quantity was questionable because it was factually impossible for Beauchesne to be incarcerated in federal custody and to be out distributing marijuana.  (Id.; see PSI ¶ 11.)  Howard believes that his attorney should have immediately filed a motion to suppress all allegations based on this observation by the AUSA on the grounds that the allegations were based on hearsay, were uncorroborated, were factually impossible, and were unreliable.  (Sec. 2255 Mem. at 4.)  Howard maintains that there is substantial case law standing for the proposition that he cannot be held responsible for distributing 400 to 700 kilos of marijuana without corroborating evidence and "without confessions that are proven to be factually possible."  (Id. at 4-5.)  He further faults counsel for not raising an inadmissibility argument apropos Howard's statements on the grounds that Howard was handcuffed, in a police-dominated atmosphere, and the police failed to record his statement in any form.  (Id. at 5.)  Howard maintains that these issues lay dormant because of counsel's failure to press them, allowing the Court to find facts based on unproven allegations.  (Id. at 6.)

Howard also argues that his attorney failed to present an adequate or competent defense during sentencing.  (Sec. 2255 Mem. at 13.)  He claims that his attorney should have attacked statements made by the prosecutor in the hopes of enhancing Howard's sentence. (Id.)  That is, Howard believes that the prosecutor made representations about the weights of the marijuana and defense counsel failed to argue, that under Crawford v. Washington, 541 U.S. 36 (2004), these statements by the prosecutor were not inherently reliable (indeed factually impossible) hearsay vis-à-vis which he was not able to confront

7

the witness.  (Id. at 13-14.)    Howard persists in his argument that counsel should have continued to object at sentencing on the basis that it was impermissible -- under Apprendi v. New Jersey, 530 U.S. 466 (2000), Blakely v. Washington, 542 U.S. 296 (2004) and United States v. Booker, 543 U.S. 220 (2005) --  for this Court to enhance his sentence based on its own factual findings, as opposed to a jury determination.  (Id. at 14.)

The United States responds to Howard's Ground-One and Ground-Five complaints apropos his counsel's performance by pointing out: "The drug amounts attributed to Howard consisted only of the amounts Howard himself described."  (Gov't Resp. at 14-15.)  It explains that the PSI held Howard responsible for 1,800 pounds of marijuana meriting a base level of 30; that the court (somewhat reluctantly) accepted the stipulation to a base offense level of 28; and that for Howard to have dropped to an even lower base level the distribution would have had to have been of less than 882 pounds, which is 1000 pounds less than the PSI's estimate.  (Id. at 15 n.4.)   Counsel's success in entering into the stipulation for a 28 base offense level was, in the Government's view, to Howard's distinct advantage.  (Id. at 16.)  The United States stresses that the drug quantity arrived at in the PSI did not correlate to the money seized from Howard's home, was calculated vis-à-vis activities beginning in September 2001 (not ten years back), and excluded the amounts that Howard thought he had received from Beauchesne during the latter's imprisonment.  (Id. at 15.)  The United States highlights the fact the First Circuit noted in its judgment, set forth above, that Howard's statements against his penal interests were sufficient to arrive at a reasonable estimation of the drug transactions.  (Id.) With regards to the hearsay argument made by Howard, the United States urges that it would

be obvious to competent counsel that he could not successfully press a hearsay argument apropos Howard's own admissions against his interests.  (Id. at 16.)

I agree with the United States' assessment of counsel's performance apropos these four PSI paragraphs and Howard's related fifth ground.   There was no tenable basis for counsel to move to suppress statements for purposes of the sentencing hearing or for arguing that Howard's self-attribution of drug quantities was hearsay.  The issue of drug quantity in connection with Howard's representations of his responsibility for drugs during the Beauchesne incarceration was completely addressed at sentencing and there was no prejudice flowing from this narrative glitch.  (Sentencing Tr. at 5-8.)  Quite simply, there is no Strickland infirmity vis-à-vis counsel's efforts concerning the PSI. See e.g., United States v. Labrada-Bustamante, 428 F.3d 1252, 1260 -61 (9th Cir. 2005); Patterson v. United States, 133 F.3d 645, 648 (8th Cir. 1998); United States v. Brewer, 60 F.3d 1142, 1145 (5th Cir. 1995).

### Counsel's Failure to Discuss the Stipulation with Howard (Ground II)

In his second ground Howard asserts that his defense counsel failed to discuss the drug quantity stipulation with Howard.  (Sec. 2255 Mem. at 6.)   Howard's sentencing memorandum states apropos drug quantity:

> STIPULATION AS TO DRUG QUANTITY
> The parties have agreed to, and hope the court accepts, a base offense Level of 28 as to drug quantity. Still, the Defendant urges the court to take into consideration the circumstances of his arrest and post arrest statements in its sentencing decision. Section 1B1.3 states relevant conduct consists of "all acts and omissions, committed, aided, abetted, counseled, commanded induced, procured or willfully caused by the Defendant." U.S.S.G. § 1B1.3(a)(1)(A). Relevant conduct must be based on sufficiently reliable information in order to be considered.
> It has been established that some of the information provided by the arresting officers was inaccurate. The Pre-Sentence Investigation Report states that Mr. Howard told the officers that Chester Beauchesne

9

> supplied him with between 100 and 150 pounds of marijuana each month
> from September 2000 to September 2001 and between 30 and 50 pounds
> of marijuana each month from September 2002 to November 2004. See
> Pre-Sentence Investigation Report ¶¶ 6, 8. Yet, Mr. Beauchesne was
> incarcerated from December 2000 to January 2003 and could not have
> supplied the marijuana to Mr. Howard at these times.

(Def.'s Sentencing Mem. at 12-13.)

Howard complains that counsel never had him sign this stipulation, asserting that it is the policy of the United States Sentencing Commission that these stipulations be set forth in writing.  (Sec. 2255 Mem. at 6-7.)  He notes that the firearm stipulation was in writing and entered into the record.  Professing not to have been made aware of the drug quantity stipulation until informed about it by appellate counsel, Howard indicates that he did not object to the stipulation at sentencing because he had little experience with the law, did not know what a "Level 28" was, relied on his attorney for guidance, and thought that when he acknowledged the stipulation at sentencing the court was referencing the gun stipulation.  (Id. at 7.)  If he had known of the drug stipulation at sentencing and if his attorney had informed him of his right to object, Howard maintains that he would have done so.  (Id.)  Howard represents that his attorney "assured" him "that properly handled, there was a possibility that the Court would place him on probation."  (Id. at 8.)

In his reply memorandum Howard maintains that counsel's agreement to the drug quantity/offense level stipulation without disclosing it to Howard "is a clear and substantial element in Petitioner's claim of ineffective assistance of counsel in his Petition for Writ of Habeas Corpus under 28 U.S.C. § 2255."  (Movant's Reply Mem. at 1.)  He repeats that the factual basis for the stipulation,

was essentially based solely upon statements attributed to the Petitioner, that he allegedly made that for the most part were not used.  The statements were not useable because the individual from whom the Petitioner was allegedly purchasing illegal drug products from was in fact incarcerated during the relevant time.  At the very least, effective counsel would have investigated this fact, and brought this issue to the Court.

Effective Counsel would have conducted a more thorough effort at verifying the quantities as said quantities were highly suspect due to the aforementioned individual's incarceration, and therefore, speculative at best.  Had Defense Counsel interacted with the Petitioner sufficiently, making certain that the Petitioner understood that the drug quantities in play at sentencing were far and beyond those in the Information, Prosecution Version of Events, and Plea Agreement, the Petitioner would not have accepted the Plea Agreement, and would have elected instead to proceed to a jury trial.

In short, Defense Counsel's ineffectiveness eliminated and deprived the Petitioner of his ability to make informed decisions on the drug quantity, beyond the documents presented to the Petitioner, which minimized his opportunity to fully comprehend his exposure, and instead, painted an acceptable but false picture to which the Petitioner agreed, and the resulting sentence.

Petitioner has set forth facts to support his claim of ineffective assistance of counsel that would have changed the course of his decision-making process, and in all likelihood, the final outcome.

The most telling fact is Defense Counsel's failure to fully explain and disclose the potential impact of the exaggerated and excess drug quantities, and that Defense Counsel stipulated to without the express knowledge, consent, or authorization of the Petitioner. Petitioner only learned of this stipulation from his Appellate Counsel.  It is crystal clear that taken [sic] the Court's questioning of the Petitioner at the Change of Plea hearing and Sentencing, that the Petitioner relied upon and was under the sole understanding and impression that it was the Information, Prosecution Version of Events, and Plea Agreement that formed the basis of the drug quantity to which he would be sentenced.  This drug quantity, was to the mindset of the Petitioner, that quantity as set forth on the specific dates of November 5 and November 8, 2004.  No other drug quantity was agreed or stipulated to by the Petitioner.

This lack of understanding by Petitioner, lack of discourse to him, and lack of knowledge in this case goes directly to the weight and depth of the failure of Defense Counsel to effectively represent the interests of the Petitioner.  It further points to the acquiescence of Defense Counsel with and to questionable and at best, alleged, admissions attributed to the Petitioner that are in fact, nothing more than the Subject of secondhand hearsay, and this is nothing short of negligence by Defense Counsel.  At the very minimum, if Defense Counsel had properly objected to the use of such tainted and speculative admissions, there could have been, and in all

11

likelihood, would have been, a significant reduction in the drug quantity
attributed to the Petitioner, and as a result, a lower end sentence imposed.

(Id. at 1-3.)

With respect to Howard's assertion that he was relying on the drug quantities set

forth in the information, the prosecution version, and the plea agreement these,

documents provided as follows.  The information sets forth one count for November 5,

2004, and one count for November 8, 2004, with both counts charging a violation of 21

U.S.C. § 841(a)(1) and citing the penalty provision of 21 U.S.C. § 841(b)(1)(D).  (Crim.

No. 05-13-P-H, Docket No. 19.)  The prosecution version represented that on November

5, 2004, a cooperating informant received approximately four pounds of marijuana from

Howard and on November 8, 2004, agents recovered multiple wrapped packages

containing marijuana in a search of Howard's premises and that the marijuana both

purchased and seized from Howard was less than 50 kilograms.  (Id., Docket No. 21.)

With respect to the plea agreement, the parties agreed that the penalty provision of 21

U.S.C. § 841(b)(1)(D) applied and that the "maximum statutory penalties which may be

imposed upon conviction of either Count I or Count II are imprisonment of not more than

5 years."  (Id., Docket No. 22.)

In his 28 U.S.C. § 2255 memorandum Howard points out that this Court remarked

during sentencing that it was troubled by the drug quantity stipulation.  Indeed, at

sentencing the Court explained:

> The most difficult question is the stipulation on the drug quantity.
> The probation officer has laid out in the presentence report the basis upon
> which he calculated the drug quantity, and the quantities there come
> straight from the defendant's mouth, and are calculated on a conservative
> basis taking the lower number at a time that the defendant estimated a
> range in terms of quantity, and then the probation officer has subtracted

12

the amount of time that the supplier Buschene [2] was actually in prison, and therefore presumably unable to supply the marijuana when Mr. Howard had told investigators that he had been obtaining it from Mr. Buschene.

I, as I say, am troubled by the stipulation. I am ultimately going to accept it on these grounds. I, first of all, credit entirely the probation officer's calculations. Nevertheless, I observed that even with subtraction, we would be assuming that Mr. Buschene was able to immediately regain his distribution amounts immediately on his release from prison, and on a time before he went into prison during pretrial supervision, and so given the stipulation and giving the defendant the benefit of the doubt, I am going to find the drug quantity to be at the lower level … under 700 kilograms, level 28, but having done that, I will also say that I thereby exhausted all the other elements there might be for reducing the sentence ….

(Sentencing Tr. at 28-29.)

It is evident that the Court was troubled by the stipulation in that it may have bestowed <u>too great a benefit on Howard</u>, rather than too little. Even if counsel failed to inform him of the drug quantity stipulation and Howard was truly blindsided by it, he cannot demonstrate <u>Strickland</u> prejudice in view of this Court's skepticism about whether he should be afforded the benefit of the doubt thereby obtained. Other than complaining about the attribution of certain quantities while Beauchesne was incarcerated – a question that was clearly resolved in his favor prior to sentencing – and suggesting that his own statements about drug quantity were unreliable hearsay, Howard has not demonstrated that defense counsel had any grounds for questioning that the best he could do was to achieve a base offense level of 28.

### *Defense Counsel's Failure to Challenge the Chain Custody (Ground III)*

In his third 28 U.S.C. § 2255 ground Howard speculates that the evidence held by the Government which incriminated him was accessed by "many different individuals, and there are issues as to how, where, and how securely it was stored"; Howard believes

---

[2]     The "Buschene" spelling in the transcript differs from the "Beauchesne" spelling used by the United States and the PSI preparer.

that his attorney "had a responsibility to investigate, question, and challenge the chain of custody, as would have any competent counsel." (Sec. 2255 Mem. at 8.)   Howard cites to an investigative report that he apparently has as a consequence of discovery (but which he has not provided as part of his 28 U.S.C. § 2255 pleadings) and focuses in on the chain of custody apropos Exhibit 6, "described as 1.79 kilos of marijuana." (Id. at 8.)  He notes that the report indicates that the marijuana was turned over to the Windham Police Department and Agent Thibodeau, instead of remaining in federal custody. (Id. at 9.) Howard complains that there is no discussion as to how the Windham Police Department or Thibodeau handled or stored this exhibit or who else may have handled it. (Id.)

        In another referenced, but not filed, report, Howard continues, there is a representation that Thibodeau maintained custody of the seized firearms until they were turned over to Special Agent VanAlstyne, of the Bureau of Alcohol, Tobacco, and Firearms. (Id.)  Asserting that these firearms may have been contaminated by other evidence, particularly the seized marijuana, Howard opines that "contamination of either evidentiary Exhibit by the other is absolutely possible." (Id.)  He maintains that the "primary reason" his sentence was enhanced was because there was allegedly marijuana in the chamber of one of the firearms. (Id. at 9-10.)  Howard insists that the firearm was in a secure gun safe at his home and was never in contact with or used any time in relation to the marijuana. (Id. at 10.)   He notes that there was never a laboratory analysis done of the firearms and that "the evidence of the residue in a chamber is nothing more than unproven hearsay." (Id.)

        The third area of the investigative report on which Howard focuses relates to Exhibit 7, which is approximately fifteen pounds of marijuana, and Exhibit 8, which is

14

approximately 6 pounds of marijuana.  (Id.)  The report indicates that Agent McVane

processed  -- without explaining what "processed" means -- and had custody of both of

these exhibits but does not show for how long he had custody and where the exhibits

were stored before they were shipped to the lab.  (Id.)

> In sum, Howard argues that his attorney,
>
> > failed to scrutinize or challenge any of the chain of custody.  Serious
> > questions and issues exist regarding the custody, handling, access, and
> > transport of Exhibits and the contamination of Exhibits by other
> > mishandled Exhibits, especially the marijuana.  There are questions as to
> > how the Windham Police Department handled the Exhibits in its charge
> > and who had access.   There are questions as to what was the actual
> > amount of marijuana in possession of  TFA agents as it would appear that
> > a quantity was ultimately missing.  Further, in the absence of any positive
> > laboratory tests and findings, Exhibit 7 is nothing more than "green plant
> > material" and not positively identified as marijuana, and there is no
> > evidence as to what was contaminating a firearm if anything.

(Id. at 10-11.)

As for this third ground, the United States argues in return that the Federal Rule of

Evidence 901(a) authentication requirement applies to the admission of evidence at a trial

and is not applicable to sentencing determinations made by the Court, citing United

States v. Fanfan, 468 F.3d 7, 15 (1st Cir. 2006).  (Gov't Resp. at 19-20.)[3]  It asserts with

respect to the firearm issue, that the firearm stipulation conceded that five firearms,

including a semi-automatic .380 caliber pistol with marijuana residue, were found inside

the safe that contained marijuana.  (Id. at 21.)  And in his 28 U.S.C. § 2255 memorandum

Howard concedes that the gun – as opposed to the drug quantity – stipulation was valid

and approved by him.  (Id.; Sec. 2255 Mem. at 7.)  In addition, the United States argues

---

[3]     The United States also asserts that Howard waived all non-jurisdictional challenges – including
this chain of custody claim – when he pled guilty to the two counts of conviction.  I am not convinced that
the court would have rebuffed a well-founded chain-of-custody type argument at sentencing because of that
waiver.

that the Court could have validly enhanced his sentence even in the absence of evidence of a residue on the pistol.  (Gov't Resp. at 21-22.)

With respect to Howard's suggestion that a chain-of-custody challenge to the marijuana might have resulted in a determination that the plant material seized was not marijuana, the United States points to Howard's post-Miranda statements admitting distribution and that the marijuana in his home belonged to him.   (Id. at 22.) Furthermore, Howard assured this Court that the facts set forth in the prosecution version were true, an assurance that included the prosecution version's representation that the wrapped packages removed from his home contained marijuana (and that a representative portion of the substance seized tested positive for the presence of marijuana).  (Id. at 22-23; Prosecution Version, Crim. No. 05-13-P-H, Docket No. 21.)

In my opinion, Howard's chain-of-custody arguments are hind-sight shots in the dark, conclusory, contradicted by the record, and self-serving.  See Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007); McGill, 11 F.3d at 225-26.   In view of Howard's concessions as to the marijuana and the gun, his defense attorney had little reason to devote time and resources to a chain-of-custody challenge at sentencing.

### *Failure of Counsel to Explain Sentencing Exposure Prior to Entering Plea (Ground IV)*

Howard's fourth ground is tethered to a plea agreement that he was offered on February 8, 2004, and the alleged failure of his counsel to discuss with Howard the guideline range associated with this offer.  (Sec. 2255 Mem. at 11.)   As a consequence of his attorney's failure to analyze the agreement and to consider negotiating an alternative, Howard accepted the plea agreement "without full knowledge or understanding."  (Id. at 11-12.)  By way of factual background, Howard states:

On February 8, 2004, at approximately 4:00 PM, [Howard's attorney] Atty. Launie faxed to the Petitioner a copy of a plea agreement offer. Launie stated that this plea agreement, "… was the best offer you're going to get…", and that I should read it. Launie stated that the Government's offer was for the Petitioner to plead guilty to distribution of 1.79 kilos on November 5, 2004, and for possession of 9.29 kilos on November 8, 2004, and that there would be no charge for the possession of the hunting rifles. Launie stated that by pleading guilty to these two counts, that at the maximum, Petitioner would be sentenced to 12 to 18 months in prison. Mr. Launie also argued that by not fighting the forfeiture of Petitioner's home, that the Government would take a more lenient position at sentencing (in fact the Government offered no consideration for the forfeiture and the acceptance by the Petitioner of the same). Within 2 hours, Petitioner was offered a plea agreement, accepted it, and signed it. Atty. Launie <u>never</u> asked the Government for any changes or even attempted to negotiate with the Government for better terms. In fact, Launie informed the Petitioner that unless he signed the plea agreement, the Government would convene a grand jury, indict the Petitioner, and as a result, Petitioner would face harsher penalties under the Guidelines. Atty. Launie failed to inform the Petitioner of what in reality were his Sixth Amendment rights to a trial by a jury or his other Constitutional rights in this matter.

(<u>Id.</u> at 12.)

Howard now maintains that he never sold 400 to 700 kilos of marijuana at anytime in his life. (<u>Id.</u> at 13.) He also asserts that he never used a firearm for any purpose related to his personal marijuana use or the sale of marijuana; the firearms were solely used for sporting purposes and were kept unloaded in a gun safe. (<u>Id.</u>)

With regards to the decision to plead guilty and his sentencing exposure, the United States believes that "the record belies the assertion" that the plea was involuntary. (Gov't Resp. at 24.)[4] It points to the Rule 11 hearing and the Court's exchange with Howard about his trial rights and the potential punishment, with Howard assuring the Court that he understood his sentencing exposure.

---

[4]    The United States points to the First Circuit's determination that Howard was adequately advised that each count carried a maximum term of imprisonment and that this Court never implied that these terms would be necessarily concurrent. (Gov't Resp. at 23.) The First Circuit placed the onus on Howard to seek further clarification of the penalties. ( <u>Id.</u>)

The relevant portion of the plea hearing is as follows:

THE COURT: … I .. have …to be satisfied that there is a factual basis for your guilty plea, so I need to ask more questions. We will follow the same rules. Tell me if you don't understand. I will reword the question. Tell me if you want to talk to your lawyer, and I will let you do that. First of all, sir, have you pleaded guilty to the two counts in the information because you actually committed both of those crimes?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Launie, are you satisfied that Mr. Howard pleaded guilty because he is actually guilty?

MR. LAUNIE: Yes, Your Honor.

THE COURT: Mr. Howard, I know you've got a copy of the information; did you have enough time to discuss the charges with your lawyer?

THE DEFENDANT: Yes, I have.

THE COURT: Did your lawyer explain to you not only the elements and nature of the offenses, but also the penalties that can be imposed?

THE DEFENDANT: Yes, he has.

THE COURT: Mr. Launie, are you satisfied that Mr. Howard understands the charges and the penalties?

MR. LAUNIE: I am, Your Honor.

THE COURT: I have all ready gone over the information with you, Mr. Howard. By pleading guilty to these two charges, you must pay a mandatory assessment of $100.00 on each count, for a total of $200.00. You are also subject to fines of up to $250,000 on each count. You are also subject to time in prison of up to five years on each count.

Following any time in prison, you are subject to a period of supervised release of at least two years, and as much as life on each count, and if you should violate any of the terms of your supervised release, you could be put back into prison for up to two additional years on each count; do you understand these penalties?

THE DEFENDANT: Yes I do, Your Honor.

THE COURT: Do you understand that you have the right to plead not guilty to these charges?

THE DEFENDANT: Yes, I do.

THE COURT: You have the right to a trial by jury, the right to the assistance of your lawyer at such a trial, and if you cannot afford a lawyer, you have the right to have a lawyer appointed for you at government expense; do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: At a trial, you would not have to prove that you are innocent. You would be presumed innocent. The government would have to prove you guilty beyond a reasonable doubt; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: At a trial, the government witnesses would have to come into open court and testify in front of you and your lawyer. Your lawyer would have the opportunity to cross-examine those witnesses, to object to evidence the government offered, to offer evidence in your behalf, and to compel witnesses to come to Court; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You would have the right to testify at trial if you wanted to. You would also have the right not to testify, and you could not be required to testify at trial.

If you chose not to testify, I would instruct the jury that they could draw no inference or suggestion of guilt from the fact that you did not testify; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If I accept your guilty plea, you will have given up your right to a trial, and the other rights that I just described to you, and there would be no trial of any kind on this information; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I will proceed to enter a judgment of guilty and I will sentence you on the basis of your guilty plea. If all of that happens, you will have virtually no right of appeal from your conviction; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: By pleading guilty, you also give up your right not to incriminate yourself, at least to the extent of the questions that I asked you this afternoon about your conduct that gave rise to these charges. You must answer my questions truthfully. I'm going to take your answers as true and act accordingly; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And in light of all I have just explained to you, do you still chose to plead guilty to the charge contained in Counts One and Two of the information?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I am looking now at a document labeled "prosecution version" signed by Assistant US Attorney Conley, March 7th. Mr. Conley, is this the evidence the government would produce if the matter did proceed to trial?

MR. CONLEY: It is, Your Honor.

THE COURT: Thank you. Mr. Launie, have you read and discussed the prosecution version with your client?

MR. LAUNIE: I have, Your Honor.

THE COURT: Are you satisfied that the government can, in fact, produce the evidence contained in that document?

MR. LAUNIE: I am, Your Honor.

THE COURT: Are you satisfied that the admissible part of that evidence would led a properly instructed jury find beyond a reasonable doubt that Mr. Howard is guilty of each of the two counts?

MR. LAUNIE: It is my opinion that it would, Your Honor.

THE COURT: Mr. Howard, have you read and discussed the prosecution version with your lawyer?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is there anything in that document you disagree with?

THE DEFENDANT: No, Your Honor.

THE COURT: Is the information given me there true to your own personal knowledge?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I read that document before I came into the courtroom. I find there is a factual basis for the guilty plea to each of the two counts. The prosecution version is admitted as a court's exhibit for purposes of this Rule 11 hearing. Mr. Howard, has anybody threatened you or tried to force you in anyway to plead guilty?

THE DEFENDANT: No, Your Honor.

THE COURT: I understand that you are willing to plead guilty because you and your lawyers have had discussions with the prosecution that have resulted in a written plea agreement; is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I want to take a look at that agreement with you now, so if your lawyer will put in front of you a copy of the signed version. When you are satisfied that that's your plea agreement, turn to the signature page which appears to be page three. Is that your signature halfway down the page?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you sign it voluntarily?

THE DEFENDANT: Yes I did, Your Honor.

THE COURT: Did you read it before you signed it?

THE DEFENDANT: Yes, I did.

THE COURT: Did you understand everything before you signed it?

THE DEFENDANT: Yes, I did.

THE COURT: In signing it, did you intend to agree to all its terms and conditions?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I want to look at a couple of those terms with you. First of all, on page two, paragraph two, do you understand that in that paragraph, you are agreeing to forfeit -- that means you will give up all of your rights to, all your ownership rights to -- the assets that are listed there; do you understand that?

THE DEFENDANT: Yes, I do, Your Honor.

THE COURT: Look at paragraph five at the bottom of page two. This paragraph provides that if for any reason in the future, you were ever allowed to withdraw your guilty plea and go to trial, all of the things that you are saying to me here this afternoon, and all of the things in this plea agreement, could be used against you at such a trial; do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: As far as sentencing is concerned, Mr. Howard, this plea agreement from which you and your lawyer and the prosecutor can make recommendations to me about the sentence, but the authority to determine the sentence stays with me as the Judge, and if I do not accept those recommendations, or if the sentence turns out to be more severe than you hoped for, you will still be bound by your guilty plea and have no right to withdraw it; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: There are advisory Sentencing Commission Guidelines that will have an effect on your sentence. Have you and your lawyer talked about how those Sentencing Commission Guidelines may affect the sentence?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I cannot determine what the advisory guidelines provide by way of a sentence until I read a Presentence Report that the probation office will prepare, and then I will give your lawyer and the prosecutor an opportunity to challenge the facts that the probation office reports. After I determine what guideline does apply to your case, there still may be circumstances where I do not follow the advisory guideline, but instead impose a sentence that's more severe, or less severe than the sentence called for by the advisory guideline; do you understand.

THE DEFENDANT: Yes, Your Honor.

THE COURT: You and the government will have the right to appeal any sentence that I impose. Now you will be required to actually serve in a jail or prison, all or any imprisonment term that I impose, except for good time deductions. You will not be permitted to serve any part of it on parole; do you understand?

THE DEFENDANT: Yes, Your Honor.
THE COURT: Aside this written plea agreement that we've talked about, has anybody made any other promise to you to get you to plead guilty?
THE DEFENDANT: No, Your Honor.
THE COURT: Has anyone made any promise to you as to what kind of sentence I will impose?
THE DEFENDANT: No, Your Honor.
THE COURT: Has anyone made any promise to you as to what the prosecutor's sentencing recommendation will be?
THE DEFENDANT: No, Your Honor.
THE COURT: I ask you finally then, do you still want to plead guilty to both counts of the information?
THE DEFENDANT: Yes, Your Honor.
THE COURT: Mr. Launie, do you, as Mr. Howard's lawyer, still recommend that I accept his guilty plea?
MR. LAUNIE: I do, Your Honor.
THE COURT: Mr. Howard, I have observed you and your demeanor and attitude throughout these proceedings. I find that you are not under the influence of any substance that might impair your judgment. Since you acknowledge that you are, in fact, guilty as charged in both counts of the information, since I find that you know of your right to a trial and the rights associated with a right to a trial, since I further find that you know the maximum possible punishment that can be imposed if you are convicted, since I find you have not been coerced, that you have voluntarily and knowingly pleaded guilty to both counts, I now accept your guilty plea. I order that the plea agreement be accepted. I order the preparation of the customary Presentence Report.

(Rule 11 Tr. at 8-18.)

This plea colloquy is thorough and under <u>United States v. Marrero-Rivera</u>, 124 F.3d 342, 349 (1st Cir. 1997) the voluntariness of the plea cannot now be assailed on the strength of Howard's second thoughts.[5]  With respect to counsel's performance, the plea colloquy is strong evidence of Howard's contemporaneous agreement with the terms of

---

[5]      The United States also points out that Howard does not assert that he would not have pled guilty had he known his sentence exposure, that if he had gone to trial he would have faced the same sentencing exposure but would not have received a reduction in the offense level for acceptance of responsibility, and would have sacrificed the Government's acquiescence to the favorable drug quantity stipulation.  (Gov't Resp. at 24-25.)

the plea agreement and satisfaction with counsel's advice to change his plea.  See
Roberson v. United States, 901 F.2d 1475, 1477 -79 (8th Cir. 1990).  The plea agreement
and the Court's plea colloquy were crystal clear as to the possibility of receiving five
years on each of the two counts.  In advising Howard to plead, counsel would have had at
the front of his mind the facially admissible implicating statements made by Howard and
the advantages of setting the floor work for an acceptance of responsibility adjustment.
These factors go to both the performance and prejudice prongs of Strickland/Hill.
Another facet of the prejudice analysis is the later-realized stipulation to a base level of
28, which was highly favorable to Howard.  Had Howard gone to trial his drug quantity
exposure would have been markedly higher.  Howard's own proffer of his consultation
with his attorney prior to accepting the plea is evidence that counsel was making a
strategic decision when advising Howard on the plea and that he did not believe there
was a better deal to be had.  This Court's oral sentencing conclusions demonstrates that
there was a real potential for a higher sentence had counsel and client approached the
case in a more contentious manner.

### Counsel's  Alleged Conflict of Interest (Ground VI)

In his sixth and final 28 U.S.C. § 2255 ground Howard maintains that his attorney
was laboring under a conflict of interest because his representation of Howard stemmed
from an interest in being paid a "huge fee" rather than an interest in doing a competent
job as a defense attorney and because of "an allegiance and close friendship" with the
prosecuting AUSA.  (Sec. 2255 Mem. at 15.)    Howard alleges that his attorney "did
virtually no preparation" for his case, failed to challenge and investigate statements,
charges, drug amounts, and chain of custody, and did not inform Howard apropos the

drug amount stipulation and how the United States Sentencing Guidelines impacted
Howard's case.  (Id.)   He reiterates his complaints about his attorney's advice to plead
guilty. (Id. at 15-16.)  And -- for this simple guilty-plea case -- Howard laments, his two
attorneys, Attorney Launie and Attorney Goodman, charged him a fee of $60,000.

> Factually Howard adds:

> Based upon the errors committed by Atty. Launie, Petitioner filed a
> complaint with the Legal Fee Arbitration Board of Massachusetts since
> Atty. Launie is a member of the Massachusetts BAR and his main office is
> in the State of Massachusetts.  (Case number L 06-021).
> The discovery process resulted in the Petitioner receiving itemized
> bills from Atty. Goodman that in essence reflected double-billing, and
> Atty. Launie indicated that meetings with the Petitioner, none of which
> ever lasted more than 2 hours, were billed at 5 and 6 hour meetings.
> Atty. Launie's sole interest in the Petitioner was retention of the
> full retainer of $60,000, and not providing the best legal representation
> and advice to the Petitioner.
> The decision of the Legal Fee Arbitration Board in this matter
> speaks for itself.  It lowered the fee for both attorneys and the Petitioner
> was to be paid a refund by the Board's order because the work provided by
> Atty. Launie and Atty. Goodman was substandard and the fees excessive.

(Id. at 16.)

> With respect to the relationship between defense counsel and the AUSA, Howard
asserts that Attorney Launie had a close personal relationship with AUSA Conley,
evidenced as follows:

> On December 16, 2004, at the first meeting between the Petitioner, Atty.
> Launie, and AUSA Conley, Conley commented to Launie that he (Launie)
> had lost a sport[']s bet to him owing as payment a six-pack of beer.
> This personal relationship is further reflected in a list of witnesses
> that Atty. Launie provided to the Legal Fee Arbitration Board of
> Massachusetts.  Atty. Launie filed this list of witnesses who would appear
> on his behalf.  Prominent on the list is the name of AUSA Conley.
> (Exhibit attached.)[6]

---

[6]     The witness list that Howard refers to is a witness list filed by Attorney Launie in the
Massachusetts fee arbitration board proceeding and AUSA Conley is listed as a witness, along with
Attorney Goodman, Attorney Alan Crede, and Launie himself.  (See Docket No. 1-2.)

> In the instant case, Atty. Launie was serving himself by coercing the Petitioner into quickly accepting a plea agreement, and he was also assisting his friend, AUSA Conley to secure a quick plea agreement and by allowing the Government to literally have its own way at sentencing as evidenced by the complete failure of Atty. Launie to challenge anything, and to even erroneously increase Petitioner's sentence exposure.

(Id. at 16-17.)

The United States, citing Mickens v. Taylor, 535 U.S. 162, 171 (2002), recognizes that Howard does not need to demonstrate prejudice on this claim; only that a division of loyalties on the part of his attorneys affected their performance.   (Gov't Resp. at 25.)  But it also insists – citing United States v. Burgos-Chaparro, 309 F.3d 50, 53 (1st Cir. 2002) – that mere speculation that divided loyalties may have adversely impacted his case is insufficient to support such a claim.  (Id.)

Howard may have legitimate reasons to challenge the fees charged by his attorney – and it seems the legal fee arbitration board agreed that he had a legitimate beef.  But, as the United States points out, Howard does not explain how the billing of a high fee to Howard (as opposed to a third party who might have other fish to fry)  would in any way divide an attorney's loyalty from his or her client.  Indeed, on an intuitive level it seems the opposite would be the case.  As for the banter about a beer debt between the defense and the prosecutor, it quite simply is not unusual that attorneys on opposing sides of the courtroom share friendly, non-professional relationships.  Without more, this banter does not raise a tenable claim of a conflict of interest on the part of defense counsel.  Finally, as for defense counsel's listing of the AUSA on his list of witnesses in the fee arbitration matter, this too is an unsurprising decision on the part of an attorney defending his fees in a particular case as it is often opposing counsel who has the most probative firsthand knowledge of efforts made by defense counsel on behalf of his or her client.

25

***The Motion for Discovery (Docket No. 5)***

Howard indicates in his motion for discovery that discovery would permit him to prove all the allegations and statements made in his 28 U.S.C. § 2255 motion. (Mot. Discovery at 1.)  The discovery needed in his case, Howard represents, include the written notes of government agent TFA MacVane that were created during interviews of witnesses and the interrogation of Howard. (Id.)  Howard maintains that it is important for him to examine these notes and statements as they were used by the Court at sentencing and there is disagreement concerning the content of these materials. (Id. at 2.) Howard also complains that the warrant was not properly returned to the issuing magistrate judge in that there are differences in the inventory at the time of the seizure and the inventory provided to the court. (Id.)  Furthermore, Howard believes that there must be a complete chain of custody affidavit for all the seized inventory because there are questions regarding the handling and possession of the marijuana and the firearms (which Howard contends were not in contact prior to their seizure with any of the drug products). (Id.)   Finally, Howard wants all of the DEA lab reports on the seized inventory, contending that there are serious questions regarding the material seized, particularly the identity and quantity of the substance. (Id.)  In his summary, Howard stresses most the use of the statement evidence by the court during sentencing and asserts that these statements were nothing more than uncorroborated hearsay. (Id. at 3.)

The First Circuit recently explained in Bader v. Warden, N.H. State Prison:

> Rule 6 of the Rules Governing Section 2254 Cases provides that in habeas proceedings '[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Bracy v. Gramley, 520 U.S. 899, 904 (1997), stated that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."

, __ F.3d __, __, 2007 WL 1519537, *4 -5 (1st Cir. May 25, 2007).    "Discovery is indicated where specific allegations give the court reason to believe that a petitioner may be able to demonstrate that he is entitled to relief."  <u>Sims v. Brown</u>, 425 F.3d 560, 577 (9th Cir. 2005).  "Conclusional allegations are insufficient to warrant discovery; the petitioner must set forth specific allegations of fact."   <u>United States v. Webster</u>, 392 F.3d 787, 802 (5th Cir. 2004).  Howard's representations do not trigger any reason to allow discovery of the items sought.

### *Conclusion*

For the reasons set forth above, I **DENY** Howard's motion for discovery (Docket No. 5) and I recommend that the Court **DENY** Howard 28 U.S.C. § 2255 relief.

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge

June 21, 2007